Freeman, J.,
delivered the opinion of the Court.
These cases were tried in the Circuit Court of Marshall county on writs of error coram nobis. Judgments were rendered in the first two cases in favor of plaintiffs, from which defendants prosecuted writs of error to this Court, and in the last case judgment was given for defendants, from which Morgan & Co. appealed.
We proceed to dispose of the first two cases, which present the same questions precisely.
In February, 1861, H. and B. Douglas obtained judgments against the defendant Neil, on which executions were several times issued. On petition of defendants the executions were superseded, and collection stayed, under a law of the Legislature protecting parties from execution while in the Confederate army. *439 The case ' under these proceedings remained pending during the war, no courts being held, but was dismissed on motion after the war, and judgments rendered against the parties, and their sureties on the bond for supersedeas
These -filed their application for writs of error coram nobis, alleging that James R. Neil had paid off the judgments in full in the year 1862, and that this fact could not have been proven or shown on the motion to dismiss the supersedeas, and ask that they be allowed to show the fact of payment on trial of the writ of error coram nobis.
An issue was regularly made on the fact alleged, that Neil had on the 22d of November, 1862, paid off the judgments in full, the defendants alleging by way of pleas, first, that the judgments had not been paid in manner and form as plaintiffs had alleged in their assignment of errors; and second, that the said payment was made in an illegal currency, to-wit, Confederate notes, and the same not paid to them, or their attorney, or any person authorized to receive payment in that currency for them.
On the trial of the case, McKnight, who was Clerk of the Circuit Court of Marshall county, was introduced to prove that payment was made in Confederate money, the petitioners having first read the following entry on the execution docket, made by him: “ Received, November 22, 1862, $789.87, .in full of this judgment and costs. Thos. McKnight, Clerk.”
McKnight was objected to as incompetent for reasons given in the record, but was permitted to testify. *440 We need not notice the objections to competency at present. He proved, however, that the payment was made in Confederate money, and that it was almost the entire circulating medium in that county at the time the payment was made.
The question presented is, was this payment, made under these circumstances, at the time made, a satisfaction of the judgment?
By provision of the Code, s. 4050, sub-sec. 5, it is the duty of the clerks of the several courts of this State “to receive the amount of any judgment or decree rendered in the Court of which they are clerks, either before or after execution issued thereon.” See also s. 3016, s. 3025. The Clerk then is clearly authorized by law to receive the amount of any judgment rendered in his Court. We held in the case of Turner v. Collier, at last term at this place, “that a Sheriff or other public officer, under the circumstances of the country in December, 1861, in a time of civil war, in the absence of instructions to the contrary, would be justified in receiving on executions in his hands what was passing current in the country in the payment of debts.” In this decision we followed two decisions of the Supreme Court of North Carolina, decided in 1866, and cited the rule from those cases as follows: “A Sheriff, in the absence of instructions to the contrary, would be justified in receiving what was passing currently in payment of debts of this character which he had to collect, yet, there must, says the Court, be some limit to this discretion of the Sheriff: for if he received funds *441 ■which were so much depreciated that it would amount to notice that the plaintiff would not receive them, he would be liable to the plaintiff in the execution.” Atkins v. Mooney, Phillips’s N. C. Law R., 32, 33; Emerson v. Mallet, Phillips’s Eq. R., 236, 237. With the reasoning and conclusion of the case of Turner v. Collier we are still satisfied, and adhere to it. It is true that that was the case of a Sheriff with an execution in his hands, but the principle must be the same in cases of clerks and public officers, who by virtue of their official position in those times were required to collect and receive money in their official characters. The normal state of the country was broken up by the civil war, to which Tennessee was a party. A government was in existence holding sway over the country, molding and directing in aid of its policy all the powers and agencies, not only of the various State governments which remained intact, but even the very currents of public opinion.
We need not here go into a discussion of the particular character of that government, whether a simple government de facto, as defined by publicists, or a government of paramount force, as denominated by Chief Justice Chase, in case of Thorington v. Smith. It was a government as a matter of fact, not a myth, and in the language of Chief Justice Chase, “ its existence was maintained by active military power within the territory held by it,” against the authority of the government of the United States, and while it existed, he says, it must necessarily be obeyed in civil matters by private citizens.” We know as a matter of his- *442 tor y in onr State, that the Legislature of the State gave currency to Confederate treasury notes, by authorizing “all tax collectors and revenue officers to receive these notes for State and county taxes, and for other revenue due the State and counties,” and the Bank of Tennessee was required, as the fiscal agent of the State, to receive these notes from such officers. This necessarily, while the State remained in the hands of the Confederate forces, gave currency to this paper, and indicated distinctly the public policy of the State to be that these notes should pass as currency. In fact, by these acts, they were placed on a level with the notes of the Bank of Tennessee, which were receivable in payment of public taxes of the State. In the language of the opinion of the Court in Turner v. Collier, “To require of public officers to collect on execution, or in discharge of official duties, in such funds as were insisted on in that case, gold and silver or convertible bank paper, would have been to require an impossibility, and to hold such officer responsible for that which was impossible to have been done in these changed times, when circumstances were so different, would be such injustice as no Court ought to sanction.”
The notes of the various banks of our State in other days were never a legal tender, but they were the currency of the country accepted as such by the people, and of such universal use as currency, that the officer who received them, having no instructions to the contrary, was always held to have done so properly, and the debt to have been discharged and satisfied.
*443 The case of Boyd v. Sales, 39 Georgia R., p. 74, holds the doctrine we have thus laid down. The case was a payment to the sheriff in 1863. The Court say: “ The defendant paid the amount due to the Sheriff in the only circulating medium in the country at the time. There was no notice given the Sheriff not to receive Confederate currency, nor to the defendant that such currency could not be received in payment of the debt. To protect himself against receiving the common currency of the country, it was bis duty to give notice to the collecting officers or to the party not to receive such currency in payment of his demand.” In answer to the argument that it was a hard case on plaintiff, the Court say, “so it is; but on the other hand, if the defendant, the debtor, is required to pay it over again, it will be equally hard on him;” and then they go on to add that no notice having been given not to pay in such currency, and it having been paid in good faith, the debt was discharged. See also cases of King v. King, 37 Ga., 205; Campbell v. Miller et als., 38 Ga., 304; Hutchins v. Hullman, 34 Ga., 346. These authorities, we think, place the question on the true ground, both in reason and sound public policy.
The proof shows in these cases that Confederate notes were, in the language of the witness, almost the only circulating medium in Marshall county at the time of this payment, and must necessarily have been received by all in payment of debts of this character, as well as in all the business transactions of the country. Shall the public officers be held responsible *444 for doing what everybody else did at the time, when they violated no instructions in doing so ? We think not. We think the true rule is, that if the officer acted in good faith, and took these notes when théy were passing as the currency of the country, and generally received by all in business transactions, he will be justified in so doing and the debt discharged. As á matter of course, any bad faith on his part would render him liable, or any fraud or advantage taken to compel its reception by the debtor would vitiate the payment and render it ineffectual to discharge the debt. In a word, we do not think the public officers of the country, while conforming to the public policy of the State, and not violating any instructions of parties, shall be compelled to bear the losses incident to the results of the war. It would be an exceedingly hard rule that would try the measure of their responsibility not by the circumstances surrounding them at the time, but by a state of things so entirely different as now exists.
It is equally unjust to maintain that parties who had claims in our courts in the form of judgments, shall be held to have had an insurance or guaranty against all the losses incident to that great civil convulsion through which the country passed, in the form of a liability on the part of officers and their sureties to them; or that parties paying debts in the then universal currency of the country to officers, shall alone be held not to have discharged their liability, when it was done in good faith, and no fraudulent advantage taken, while all other payments of debts made under like circüinstáncés of good faith, sháll be *445 held good. Sound policy as well as principle demand that the business transactions of every kind during the period of the war should have been considered as settled, and be held to stand as the parties made them and as the end of the war found them. All were involved in the dangers and took the perils of the strife, and all should bear its legitimate losses as part of the burden imposed on the society of which they made a part, and no man or class of men should be permitted to reap advantage by reason of the great public misfortune to which his country was subjected by reason of being involved in a great civil war. These parties stood by, giving no instructions to the officer, while he accepted payment in the universally received currency of the country. They waited until the war turned out disastrously and the currency received was worthless, and then insisted on being paid again, on the ground that no authority was given; that they had never said a word in approval of the act of the officer. Their silence in such a case ought to be an estoppel, especially when it appears that their attorney had notice of the payment, which was notice to them. We find his receipt for his fees in the case in the record.
In the case of Morgan & Co. we have an additional question, not presented in the other cases we have discussed. It is claimed in this case that McKnight was not Clerk of the Circuit Court either de jure or de facto. ■
The facts are that McKnight had been elected Clerk of the Circuit Court of Marshall county in March, 1858, *446 and had given bond and qualified as such, and was again elected in March, 1862, but was never sworn in as Clerk and never gave his bond, no courts being held after that time in Marshall county. He proves that he had charge of the records of the Court, had their custody and control, and acted as Clerk; but says he does not know whether he ever issued any executions or not. The Constitution of Tennessee of 1834, art. 6, sec. 13, provides that clerks of such inferior courts as may be hereafter established, shall be elected by the qualified voters thereof for the term of four years. By the Code, s. 326, every clerk of a court, before entering upon the duties of his office, shall enter into bond, etc. He is then elected clerk by virtue of the Constitution, and by virtue of the section of the Code he is recognized as a clerk by virtue of such election, and as such clerk is required to enter into bond before he enters on the duties of his office. Without going into the numerous cases on the question of a de facto officer, or what constitutes one, we content ourselves by' saying that we hold it beyond all question that the Clerk in this case was Clerk de facto, if not de jwe, by virtue of his election to the office and his continuing to act as such, and beeping and controlling the records of the office up to the time of the receipt of this money. The formalities of induction into office, by giving bond and taking the oath of office, had not been gone through with, but this can not prevent his being Clerk de facto under and by virtue of his election to the office, and his acting in that capacity. We think this clear from all the authorities.
*447 In this case of Morgan & Co., the ■ Court refused to allow the Clerk to prove that the payment was made in Confederate money; but as we have held that the proof, if made, would not have changed the result of the case, we need not examine the question of the correctness of this ruling.
We need not discuss the other ruling of the Court, on the admission of testimony, as the questions settled are conclusive of the cases.
The two first cases of Douglas & Co. v. Neil et als. will be reversed, and the ease of Morgan & Co. v. Neil et als., will be affirmed.
Judgment in accordance with this opinion will he rendered here.
Note. — The case is different where the money was received by a private agent. See King v. Fleece, ante.